UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KARL CORNELIOUS COTTON,

                    Petitioner,                          Case No. 2:16-cv-114

v.                                                       Honorable Paul L. Maloney

DUNCAN MACLAREN,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254.
Petitioner Karl Cornelious Cotton is incarcerated with the Michigan Department of Corrections at the
Kinross Correctional Facility (KCF) in Kincheloe, Michigan.  Following a five-day jury trial in the
Kent County Circuit Court, Petitioner was convicted of first-degree murder, Mich. Comp. Laws
§ 750.316.  On February 14, 2013, the court sentenced Petitioner as a habitual offender-fourth offense,
Mich. Comp. Laws § 769.12, to a prison term of life without the possibility of parole.

On April 24, 2016, Petitioner filed his habeas corpus petition raising four grounds for
relief, as follows:

>    I.    The trial court abused its discretion when it denied a defense motion for an
>          adjournment of trial, to give the prosecution time to prepare and conduct a
>          hearing on the admissibility of the proposed expert's testimony, and when it
>          precluded the defendant from using the expert at trial, thereby denying
>          Petitioner a fair trial and a full opportunity to confront he evidence against him,
>          contrary to the protections guaranteed him by the Sixth Amendment and Const.
>          1963, Art.1, § 20, and also denying him a full opportunity to present a defense
>          under the due process guarantees secured by the Fifth and Fourteenth
>          Amendments and Const. 1963, Art. 1, § 17.  Further, trial counsel was
>          ineffective under the Sixth Amendment for failure to comply with a pre-trial
>          discovery order and the applicable discovery court rule, which failures led the
>          Trial Court to preclude the evidence from use at trial.

II.      Petitioner was denied the effective assistance of counsel where his attorney followed an unsound trial strategy, which resulted in the introduction of highly inflammatory and otherwise inadmissible evidence.

III.     In a case with no eyewitnesses to the shooting and no physical evidence linking Petitioner to the shooting, did the prosecution's misconduct, which consisted of bolstering the testimony of and vouching for the credibility of the prosecution's key witnesses, and misstating the evidence, deprived Petitioner of his Due Process Right to a fair trial. U.S. Const. Amend. XIV.

IV.      The trial court abused its discretion when it allowed admission of the supposed taped conversation with Petitioner in a jail cell, which represented improper impeachment and prejudicial evidence, violating Petitioner Cotton's constitutional rights to due process.

(Pet'r's Br., ECF No. 1, PageID.43, 50, 56, 62.)  Respondent has filed an answer to the petition (ECF No. 12) stating that the grounds should be denied because they are meritless or non-cognizable.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are, as Respondent argues, meritless or non-cognizable.  Accordingly, I recommend that the petition be denied.

On March 5, 2011, around lunchtime, George Schwab was having a cigarette on the deck of his third-floor apartment in Walker, Michigan.  (Trial Tr. II, ECF No. 13-6, PageID.313.)  He heard a strange sound, looked down, and saw that a man had just let himself out of the bedroom window of a nearby second floor apartment.  (*Id*.)  The man strode over to a car in the parking lot, hopped in the passenger side, and the car drove away.  (*Id*., PageID.314.)  Thinking it odd, Schwab wrote down the license number of the car.  (*Id*., PageID.315.)

Later, as Mr. Schwab was sitting at his computer, he thought he heard gunshots.  (*Id*., PageID.316.)  A short while after that, he noticed that the bedroom window the man had exited was still open, even though it was a cold, snowy day.  (*Id*., PageID.317-318.)  He contacted the Walker police.  (*Id*.)

The Walker police dispatched Officer Scott Malkewitz.  (*Id*., PageID.322.)  Officer Malkewitz took note of the open window and the footprints in the snow.  (*Id*.)  He knocked on the door of the apartment, but got no response.  (*Id*.)  He was directed to wait for back-up and then do a "well-being" check—to enter the apartment and check to see if someone is inside in need of assistance.  (*Id*., PageID.323.)  A maintenance man opened the door and Officer Malkewitz entered the apartment.  (*Id*., PageID.324.)  He found Jamie Powell shot dead on the bathroom floor.  (*Id*.)

Using the license plate provided by Mr. Schwab, police identified the vehicle that drove away as a work vehicle assigned to Pamela Webb.  Ms. Webb, in turn, identified the man who came out of the window as her husband Ante.  Ante Webb was the brother of Louis Chevis.  Louis lived with Jamie Powell at the apartment.

Ante jumped out the window because he had just taken money from Petitioner, who was waiting, either in the hallway or on the other side of the apartment building.  (Trial Tr. III, ECF No. 13-7, PageID.358-361.)  Ante was supposed to deliver a quantity of marijuana in exchange for the cash.  (*Id*.)  Ante did not have any marijuana.  (*Id*.)

The prosecutor theorized that after Ante bolted and Petitioner realized he had been robbed, the Petitioner took his revenge on Jamie.  The prosecutor's theory found some support in the testimony of James Coleman, the gentleman who had driven Petitioner from Benton Harbor to Grand Rapids, picked up Ante, and then waited outside in the van while Petitioner and Ante headed into the apartment building.  (*Id*., PageID.387-392.)  Coleman testified that when Petitioner returned to the car, he acknowledged he had been robbed and noted that Ante's white girlfriend—presumably Jamie—had been in on it with Ante.  (*Id*.)

The prosecutor's theory also found support from jailhouse informants who claimed Petitioner had said incriminating things, such as "she got what she deserved."  (Trial Tr. IV, ECF No.

13-8, PageID.433-447.)  At the urging of police, one of the informants, McGehee, captured some of the incriminating statements on tape.  (*Id*.)  As part of his defense, Petitioner attempted to provide expert testimony that the voice on the tape was not his.  (Mot. in Lim., ECF No. 13-4)  The proposed expert was identified late.  (*Id*., PageID.252-254.)  The judge would not provide an adjournment to permit the prosecutor to find her own expert.  (*Id*.)  Petitioner's expert's testimony was excluded by the judge.  (*Id*.)

The jury deliberated for a couple of hours before returning its verdict that Petitioner was guilty of the first-degree murder of Jamie Powell.  (Trial Tr. VI, ECF No. 13-10, PageID.518-519.)  A few weeks later, the trial court imposed the mandatory sentence of life without the possibility of parole.  (Sentencing Tr., ECF No. 13-11.)

Petitioner, with the assistance of appointed appellate counsel, raised one multi-faceted issue in his Michigan Court of Appeals brief:  habeas issue I above.  (Pet'r's Br., ECF No. 13-12, PageID.539.)  Petitioner supplemented counsel's efforts with a Standard 4 brief[1] raising three additional issues that are identical to habeas issues I, II, and III above.  (Pet'r's Std. 4 Br., ECF No. 13-12, PageID.623.)

By unpublished opinion issued September 11, 2014, the Michigan Court of Appeals rejected Petitioner's challenges and affirmed the trial court.  (Mich. Ct. App. Op., ECF No. 13-12,

---

[1] The Michigan Supreme Court's administrative order regarding minimum standards for indigent criminal appellate defense services provides:

**Standard 4**
When a defendant insists that a particular claim or claims be raised on appeal against the advice of counsel, counsel shall inform the defendant of the right to present the claim or claims in propria persona. Defendant's filing shall consist of one brief filed with or without an appropriate accompanying motion. Counsel shall also provide such procedural advice and clerical assistance as may be required to conform the defendant's filing for acceptability to the court. The defendant's filing in propria persona must be received by the Court of Appeals within 84 days after the appellant's brief is filed by the attorney . . . .

Mich. Administrative Order No. 2004-6.

4

PageID.525-535.)  Petitioner then filed an application for leave to appeal in the Michigan Supreme Court raising the same four issues he had raised in the Michigan Court of Appeals.  (Pet'r's Appl. for Leave to Appeal, ECF No. 13-13, PageID.666, 671, 673, 678.)  That court denied leave by order entered April 28, 2015.  (Mich. Order, ECF No. 13-13, PageID.661.)  Petitioner then filed his habeas petition in this Court.

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Williams*, 529 U.S. at 381-82; *Miller v. Straub*, 299 F.3d 570, 578-79 (6th Cir. 2002).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. *Greene v. Fisher*, 565

U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'"  *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. 415, 424 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

Petitioner contends his trial was rendered fundamentally unfair, and he was denied the opportunity to present a defense, because the trial court would not permit Petitioner's voice

identification expert to testify.  The voice identification expert was there for one purpose, to challenge the credibility of jailhouse informant Derrick McGehee with respect to his claim that one of two voices on a recording was Petitioner's.  The recorded statement was not the most inculpating aspect of McGehee's testimony.  The voice on the recording indicated that the victim "got what she deserved[;]" but the voice never admitted that Petitioner was the one who gave the victim what she deserved.  McGehee testified that Petitioner made that admission, he just never made it while McGehee was recording.

Petitioner's counsel had asked the expert to compare two thirty-second excerpts from the recorded statements to a recording of a police interrogation of Petitioner.  The expert digitized the recordings and then listened to them repeatedly "using the critical listening skills that [he had] developed over the course of [his] career."  (Expert Report, ECF No. 13-12, PageID.581.)  The expert concluded:  "I am ninety percent certain that the voice on the [jailhouse recording] is not [Petitioner]." (*Id.*, PageID.582.)  He identified several differences between the voice samples:

1.    Both voices have a distinctly different speaking style.

2.    The pauses and hesitations between words spoken are different.

3.    The delivery style and pronunciation of words are different.

4.    The suspect on the [jailhouse recording] is older than [Petitioner], as the voice sounds more mature.

5.    [Petitioner's] voice is higher than that of the [speaker on the jailhouse recording] who has a lower speaking voice.

6.    The way the words are grouped together on the [jailhouse] recording is different than the pacing and grouping in [Petitioner's interrogation.]

(*Id.*)

The prosecutor had presented McGehee's testimony and an excerpt of the recorded conversations at Petitioner's preliminary examination.  (Prelim. Exam. Tr. I, ECF No. 13-2,

7

PageID.203-210.)  Thus, Petitioner's counsel was aware of the existence and content of the recorded conversations from the very beginning.  Trial was initially set for November 5, 2012.  (Kent Cty. Cir. Ct. Docket Sheet, ECF No. 13-11, PageID.177.)  As that date approached, Petitioner's counsel sought an adjournment to permit him to secure a voice identification expert.  (Mot. in Lim. Tr., ECF No. 13-4, PageID.252-253.)  The court authorized Petitioner to employ the services of such an expert and adjourned the trial to January 7, 2013.  (*Id.*)

It appears that Petitioner's counsel acted promptly to secure the expert testimony.  The expert's report indicates that counsel sent him the recordings in early November 2012.  The expert, however, had still not performed his analysis as the trial approached.  Without even knowing what the expert might say, Petitioner's counsel eventually provided the expert's curriculum vitae to the prosecution.  (*Id.*, PageID.251-254.)  He did not do so until a little more than a week before trial.  (*Id.*)  The prosecutor responded with a motion in limine to exclude any testimony from an expert disclosed so late.

The prosecutor's motion was heard on January 4, 2013, the last weekday before the trial was set to begin.  By that date, the expert had prepared a preliminary report.  The parties discussed the report at the motion *in limine* hearing.  The prosecutor argued that the identity and report of the expert were disclosed too late and too close to trial in violation of discovery requirements.  She claimed it was simply too late for the prosecution to obtain an expert to rebut the expected testimony from Petitioner's expert.  Moreover, she argued that the field of voice identification was not recognized in Michigan and not the proper subject of expert testimony.  Therefore, she contended, the trial court could not permit the testimony without a *Daubert* hearing.[2]

---

[2] In *Daubert v Merrell Dow Pharm, Inc*, 509 US 579 (1993), the United States Supreme Court established a two-part test for the admissibility of scientific testimony, which requires a trial court to determine whether the proposed expert's testimony

Petitioner's counsel noted that the prosecutor was well-aware of the expert testimony he sought because it was the very reason the trial was adjourned three months earlier. Petitioner's counsel claimed further that if a *Daubert* hearing were required or if the prosecutor needed time to find her own expert, the trial should be adjourned.

The trial court reasoned that the late identification of the expert and the eleventh-hour report violated discovery requirements. The court also determined that any further delay would prejudice the prosecutor, the witnesses (several were from out-of-state), and the victim's family. The court refused to permit the testimony or to adjourn the trial.

Petitioner challenged both parts of the trial court's decision: the decision to exclude the testimony and the decision refusing to adjourn the trial. The Michigan Court of Appeals reasoned the trial court's decision excluding the expert's testimony was appropriate:

> MCR 6.201(A)(1) provides that a party shall provide "the names and addresses [of] all lay and expert witnesses" and must make the witnesses available for the other party to interview. This rule also provides "the witness list may be amended without leave of the court no later than 28 days before trial." MCR 6.201(A)(3) provides that a party must provide "the curriculum vitae of an expert the party may call at trial and either a report by the expert or a written description of the substance of the proposed testimony . . ." if the other party so requests. The party must comply with the opposing party's request within 21 days.
>
> "A defendant has a constitutionally guaranteed right to present a defense, which includes the right to call witnesses." However, this right is not absolute. The defendant must comply with procedural and evidentiary rules when presenting his or her defense. Further, the defendant's right to present a defense is not violated when, despite the exclusion of evidence, the defendant is able to present his or her theory of the case to the jury.
>
> Cotton contends that the trial court abused its discretion when it excluded the testimony of his expert witness, which in turn deprived him of his right to present a defense. We disagree.

---

reflects valid scientific knowledge, and if it does, whether the expert's testimony "will assist the trier of fact to understand or determine a fact in issue." *Id*. at 592.

Here, the trial court found that Cotton could not comply with the prosecutor's July 20, 2012 discovery request because the court did not approve funds for Cotton's expert until October 22, 2012.   However, the trial court also found that Cotton had unreasonably delayed disclosing the expert witness by waiting from October 22 to December 28, shortly before the scheduled trial, to inform the prosecutor about his expert witness.   The trial court found that the delay unfairly prejudiced the prosecutor because she would not be able to obtain a rebuttal witness.

We conclude that the trial court did not abuse its discretion when it excluded the testimony of Cotton's proposed expert witness.   Cotton waited until very shortly before trial to disclose the existence of the expert witness, and did not disclose the expert's report until the Friday before the Monday trial date.   Under these circumstances, the trial court's decision to exclude the proposed expert witness did not fall outside the range of principled outcomes.

Further, we conclude that the trial court's decision to exclude the evidence did not deprive Cotton of a substantial defense.   Cotton failed to comply with the discovery rules designed to ensure a fair trial.   And Cotton was able to argue that the voice on the recording was not his and that McGehee and Durham had reasoned [sic] to fabricate their stories about the recording and Cotton's statements.   Because Cotton was able to do so, the trial court's decision did not deny him his right to confront the witnesses or present a defense.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.528-529.)

The appellate court also affirmed the trial court's refusal to adjourn the trial:

MCR 2.503(C) provides that a party may move to adjourn a trial on the basis of unavailable evidence.   "A motion for adjournment must be based on good cause."   To determine whether a defendant's motion is based on good cause, the trial court must ascertain

whether defendant (1) asserted a constitutional right, (2) had a legitimate reason for asserting the right, (3) had been negligent, and (4) had requested previous adjournments.

Cotton contends that the trial court abused its discretion when it denied his motion for an adjournment. We disagree.

Cotton did not move for an adjournment until January 4, 2013.   Trial was scheduled to begin January 7, 2013.   The trial court also found that Cotton had requested one previous adjournment.   It found that granting Cotton's request for an adjournment would unreasonably burden the witnesses and the victim's family.   And, as noted above, the trial court found that Cotton did not have good cause for an adjournment, and that his delayed disclosure was unreasonable.   Under these circumstances, we

10

conclude that the trial court's decision to deny Cotton's request for an adjournment did not fall outside the range of principled outcomes.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.530.)

Petitioner raises his issues in this Court using exactly the same wording he used in the Michigan appellate courts. The issues so raised present claims of state law and federal constitutional violations. Petitioner's state law claims are not cognizable in this Court.

"[A] federal court may issue the writ to a state prisoner 'only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.'" *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) (quoting 28 U.S.C. § 2254(a)). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, Rules Governing Habeas Corpus Cases). The federal courts have no power to intervene on the basis of a perceived error of state law. *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *Pulley v. Harris*, 465 U.S. 37, 41 (1984).

It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw*, 546 U.S. at 76; *Estelle*, 502 U.S. at 68. The decision of the state courts on a state-law issue is binding on a federal court. *See Wainwright v. Goode*, 464 U.S. 78, 84 (1983). The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'" *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76). *See also Thomas v. Stephenson*, 898 F.3d 693,700 n.1 (6th Cir. 2018) (same). Thus, this Court is bound by the state appellate court's determinations that Petitioner failed to comply with the discovery rules and that the trial court properly applied the court rules regarding discovery and adjournments.

11

The trial court's decision to exclude the expert's testimony, to the extent Petitioner presents it as a violation of the state court rules, is the sort of state law decision that is not cognizable on habeas review.  As the Supreme Court explained in *Estelle*, 502 U.S. at 62, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Id.* at 67-68.  Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Id.* at 68.

State court applications of state court rules, whether or not it is a violation of the state rules, can rise to the level of a due process violation if it offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).  This approach accords the state courts wide latitude in ruling on evidentiary matters.  *Seymour*, 224 F.3d at 552.

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently.  The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000).

Petitioner suggests that the trial court's determinations with respect to the expert's testimony may be in conflict with *Daubert*.  The *Daubert* court was concerned with the admissibility of expert testimony under Federal Rule of Evidence 702.  *See Norris v. Schotten*, 146 F.3d 314, 335

12

(6th Cir. 1998) ("*Daubert* concerned the Federal Rules of Evidence which is not relevant to [federal habeas review of] appellant's [state court] conviction.")  As this Court stated in *Bal v. McKee*, No. 1:10-cv-21, 2010 WL 707356 (W.D. Mich. Feb. 23, 2010):

> [T]he Federal Rules of Evidence apply in federal trial proceedings, not in state trial proceedings.  The Supreme Court strictly engaged in statutory construction in interpreting Rule 702 in *Daubert*.  *See* 509 U.S. at 587.  The [Supreme] Court has never indicated that a failure to follow Federal Rule of Evidence 702 or *Daubert* rises to the level of a constitutional violation.  As a consequence, Petitioner cannot show that the state court's evidentiary determination was either contrary to or an unreasonable application of established Supreme Court precedent.

*Bal*, 2010 WL 707356, at *12.  Thus, even if excluding Petitioner's proposed expert testimony runs afoul of Rule 702 of the Federal Rules of Evidence or *Daubert*, such a violation does not rise to the level of a constitutional violation cognizable on habeas review.

In addition to challenging the trial court's actions as violative of state law and *Daubert*, Petitioner also contends those actions deprived him of his right to present a defense and confront the witnesses against him.  With those arguments, Petitioner finally touches upon federal constitutional issues that are cognizable on habeas review.

Several Supreme Court cases provide support for Petitioner's claim that he must be permitted to present a defense.  In *Crane v. Kentucky*, 476 U.S. 683 (1986), the Court concluded that the United States Constitution guarantees criminal defendants "a meaningful opportunity" to present a complete defense.  *Id*. at 690.  A central component of that guarantee is the right to offer the testimony of witnesses.  *Taylor v. Illinois*, 484 U.S. 400, 409 (1988).  Other components include the right to confront and cross-examine witnesses, *Delaware v. Fensterer*, 474 U.S. 15, 18-20 (1985), and the right to effective assistance from counsel, *Gideon v. Wainwright*, 372 U.S. 335, 343-45 (1963).

In *United States v. Scheffer*, 523 U.S. 303 (1998), the Supreme Court laid out an analytical path for consideration of a claim such as Petitioner's:

13

> A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.  *See Taylor v. Illinois*, 484 U.S. 400, 410 (1988); *Rock v. Arkansas*, 483 U.S. 44, 55 (1987); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). A defendant's interest in presenting such evidence may thus "'bow to accommodate other legitimate interests in the criminal trial process.'"  *Rock, supra*, at 55 (quoting *Chambers, supra*, at 295); *accord, Michigan v. Lucas*, 500 U.S. 145, 149 (1991).  As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials.  Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." *Rock*, *supra*, at 56; *accord, Lucas, supra*, at 151.  Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.  *See Rock, supra*, at 58; *Chambers, supra*, at 302; *Washington v. Texas*, 388 U.S. 14, 22–23 (1967).

*Scheffer*, 523 U.S. at 308 (footnote omitted).  *Scheffer* involved expert testimony; however, the testimony at issue was that of a polygraph examiner and it was excluded, not as a discovery sanction, but pursuant to a *per se* rule.  *Scheffer*'s facts are easily distinguishable from the facts of Petitioner's case; thus, *Scheffer* cannot serve as the clearly established federal law to which the state court determinations in Petitioner's case are contrary.

The Supreme Court's decision in *Taylor*, 484 U.S. at 400, tracks the facts in Petitioner's case much more closely.  In *Taylor*, the trial court refused to allow a defense witness to testify where the defense failed to timely identify the witness in response to a pretrial discovery request.  *Id*. at 401-02.  The defendant argued that the Sixth Amendment barred a court from ordering the preclusion of defense evidence as a sanction or violating a discovery rule.  *Id*. at 406.  He argued, alternatively, that on the specific facts of his case, it was constitutional error to preclude the evidence.  *Id*.

The *Taylor* court reviewed the interests of the prosecutor and the public that limit the right to present witnesses:

> The adversary process could not function effectively without adherence to rules of procedure that govern the orderly presentation of facts and arguments to provide each party with a fair opportunity to assemble and submit evidence to contradict or explain the opponent's case.  The trial process would be a shambles if either party had an absolute right to control the time and content of his witnesses' testimony.  Neither may insist on the right to interrupt the opposing party's case, and obviously there is no absolute right to interrupt the deliberations of the jury to present newly discovered evidence.  The State's interest in the orderly conduct of a criminal trial is sufficient to

> justify the imposition and enforcement of firm, though not always inflexible, rules relating to the identification and presentation of evidence.
>
> The defendant's right to compulsory process is itself designed to vindicate the principle that the "ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *United States v. Nixon*, 418 U.S. at 709.  Rules that provide for pretrial discovery of an opponent's witnesses serve the same high purpose.  Discovery, like cross-examination, minimizes the risk that a judgment will be predicated on incomplete, misleading, or even deliberately fabricated testimony.  The "State's interest in protecting itself against an eleventh-hour defense" is merely one component of the broader public interest in a full and truthful disclosure of critical facts.

*Taylor*, 484 U.S. at 411-12 (footnotes omitted).  Those countervailing interests require the trial court to exercise its discretion in imposing the proper sanction for failure to disclose a witness in violation of the discovery rules.  *Id*. at 414-15.  The *Taylor* court provided a general framework for the exercise of that discretion:

> [I]t is neither necessary nor appropriate for us to attempt to draft a comprehensive set of standards to guide the exercise of discretion in every possible case.  It is elementary, of course, that a trial court may not ignore the fundamental character of the defendant's right to offer the testimony of witnesses in his favor.  But the mere invocation of that right cannot automatically and invariably outweigh countervailing public interests. The integrity of the adversary process, which depends both on the presentation of reliable evidence and the rejection of unreliable evidence, the interest in the fair and efficient administration of justice, and the potential prejudice to the truth-determining function of the trial process must also weigh in the balance.

*Id*. at 414-15 (footnote omitted).

Against that backdrop, Petitioner's arguments that the state courts' actions here are contrary to, or an unreasonable application of, clearly established federal law fall short.  First, where clearly established federal law provides only general guidance,  there is "'greater . . . potential for reasoned disagreement among fair minded judges . . . .'"  *Renico v. Lett*, 559 U.S. 766, 776 (2010) (quoting  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).   That potential for reasoned disagreement, in turn, affords the state courts "'more leeway . . . in reaching outcomes in case-by-case determinations.'"  *Id*.  Second, the considerations that prompted the trial court to exclude the testimony in the first instance, and the court of appeals to affirm that decision, are the same considerations the

*Taylor* court identified to guide the exercise of discretion in this context.  Where the state courts considered the relevant factors and, weighing those factors in a reasonable fashion, concluded exclusion of the testimony was appropriate, the result cannot be contrary to or an unreasonable application of clearly established federal law.  That is so even if this Court might weigh the factors differently and reach a different conclusion.

The same result follows from an analysis of the trial court's decision to deny an adjournment to permit the prosecutor to obtain rebuttal expert testimony.  "The matter of a continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel."  *Unger v. Sarafite*, 376 U.S. 575, 589 (1964).  At the same time, "a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."  *Id.*  In other words, "broad discretion must be granted trial courts on matters of continuances"; the denial of a continuance will amount to a constitutional violation only when there is "an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' . . . ."  *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983) (quoting *Unger*, 376 U.S. at 589).

The trial court's decision to deny an adjournment in Petitioner's case was neither unreasoned nor arbitrary.  The trial court had already afforded Petitioner an adjournment to permit him to develop his voice-identification case.  Nonetheless, Petitioner—through no fault of his own or, apparently, his counsel—submitted the expert's initial report on the last business day before trial.  Several witnesses had already been brought in from out-of-state at significant expense and the prosecution was ready to proceed.   The prejudice an adjournment would impose on the state, and the victim's family, was readily apparent.

Under those circumstances, neither the trial court's denial of the adjournment, nor the appellate court's affirmance of that decision, can be described as unreasoned or arbitrary.  Petitioner does not even rely on that argument.  He simply concludes the scales should have tipped in his favor.

Even if this Court would have weighed the competing considerations in Petitioner's favor, Petitioner would not be entitled to relief.  Petitioner's suggestion that the trial court could have reached a different result or should have reached a different result is not enough.  Petitioner must show that the trial court could not reasonably have weighed the competing considerations to favor adjournment.  The record does not support that conclusion.

Petitioner has failed to demonstrate that the state court's decision to exclude his voice identification expert's testimony and refusal to adjourn his trial are contrary to, or an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to habeas relief on those claims.

Petitioner next argues that his counsel rendered constitutionally ineffective assistance, first by failing to comply with the discovery request, and then by following an unsound trial strategy that resulted in the introduction of inflammatory and prejudicial evidence.  The discovery violation is discussed in detail above, but the other failures—Petitioner identifies several—require further explanation.

Petitioner contends his counsel rendered ineffective assistance because he initially obtained permission to employ a handwriting expert and then never pursued the matter beyond obtaining that permission.  Petitioner suggests the expert could have testified regarding the handwriting on a letter that Petitioner sent to the judge in another case that McGehee may have helped draft.

Petitioner next argues that his counsel rendered ineffective assistance when he ignored a potential alibi defense provided by the cell-phone records.  Those records fixed particular times that Petitioner was on the road back to Benton Harbor.  In the petition, Petitioner points out that the cell-phone records cannot be reconciled with the estimated time of death.  Petitioner also notes an inconsistency between the cell-phone records and the times the neighbors estimated they heard gunshots.  Petitioner complains that his counsel simply disregarded those incongruities between

Petitioner's location according to the cell-phone timeline and the location of the shooter based on the timeline provided by other testimony.

Finally, Petitioner claims his counsel failed to impeach an investigating officer (Officer Heugel) and Ante Webb with regard to their trial testimony that Petitioner had not been seen with a gun immediately preceding the crime.  Petitioner contends that his counsel should have challenged those witnesses with their prior written statements that Petitioner had, indeed, possessed a gun immediately preceding the crime.

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  *Id*. at 687-88.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment. *Id.* at 691.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111,

123 (2009)); *see also Burt v. Titlow*, 571 U.S. 12, 13 (2013); *Cullen v. Pinholster*, 563 U.S. 170, 190

(2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the

habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s

deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the

"Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the

context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

        In resolving Petitioner's ineffective assistance of counsel claims, the Michigan Court

of Appeals applied the following standard:

> A criminal defendant has the fundamental right to effective assistance of counsel.  To
> prove that his defense counsel was not effective, the defendant must show that (1)
> defense counsel's performance fell below an objective standard of reasonableness, and
> (2) there is a reasonable probability that counsel's deficient performance prejudiced
> the defendant.  We must presume that counsel provided effective assistance, and we
> must consider the possible reasons for counsel's actions.  A defendant was prejudiced
> if, but for defense counsel's errors, the result of the proceeding would have been
> different.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.530-531) (footnotes omitted).  The state appellate court

specifically cited *Strickland* as the source of the standard; thus, it cannot be said that the court of

appeals applied the wrong standard.

        The court of appeals concluded that Petitioner had failed to satisfy either prong of the

*Strickland* standard:

> Cotton contends that counsel was ineffective for failing to timely comply with the trial
> court's discovery order.  Cotton argues that counsel's action deprived him of the rights
> to present a defense and confront the witnesses against him.  We disagree.
>
> On the record before us, we are not convinced that counsel's inability to obtain an
> expert fell below an objective standard of reasonableness.  Here, counsel indicated that
> finding an expert to review the voice recording was "challenging."  While counsel did
> not present the expert's name to the prosecutor until December 28, 2012, there is no
> evidence in the record that counsel unreasonably delayed attempting to procure the
> expert.  There is also no evidence that counsel unreasonably delayed in disclosing the
> expert or producing the expert's report once he procured an expert.  To the contrary, in
> counsel's December 28, 2012 email to the prosecutor, counsel used the present tense
> when stating that the expert was reviewing the recording.  This indicates that the expert
> had not yet finished his review and had not given defense counsel the report.  We

conclude that Cotton has not shown that defense counsel's actions fell below an objective standard of reasonableness.

Further, there is no indication that, had counsel acted differently, the result of the proceeding would have been different.  As noted above, a defendant is not deprived of a substantial defense if, despite the exclusion of evidence, the defendant is able to present his or her theory of the case to the jury.  Here, Cotton was able to present his theory that McGehee and Durham fabricated the recording to the jury.  And Cotton had the ability to cross-examine McGehee and Durham on their testimony and statements. We conclude that Cotton has not shown that counsel's actions prejudiced him.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.531) (footnote omitted).

The appellate court's findings regarding what counsel did and did not do are well-supported in the record.  Petitioner offers no evidence, much less clear and convincing evidence, to overcome those presumptively correct findings.  Petitioner's counsel promptly procured an expert and promptly provided the expert's report as soon as he had it.  There is nothing in the record to suggest that the tardiness of the report was counsel's fault.  Under those circumstances, the appellate court's conclusion that Petitioner had failed to demonstrate any unreasonableness in his counsel's actions is unassailable.

The record also supports the court of appeals' determination that Petitioner failed to demonstrate prejudice.  First, even if the disclosures did not run afoul of discovery requirements or if the trial court were willing to impose some lesser sanction, Petitioner has failed to show that the evidence would have been admitted.  Michigan Rule of Evidence 901(b)(5) permits a voice, even a recording of a voice, to be authenticated and identified by opinion testimony.  The expertise required, however, is only that of a person who has heard "the voice at any time under circumstances connecting it with the alleged speaker."  Mich. Rule Evid. 901(b)(5).  That language would not preclude opinion testimony by an expert as permitted by Michigan Rule of Evidence 702; but, the comments to Rule 901 state "[n]othing contained in MRE 901(b)(5) authorizes the admission of voiceprint evidence."

20

Mich. Rule Evid. 901, Comments.[3]  The Michigan Supreme Court upheld the trial court's decision refusing to permit voiceprint (spectrographic sound analysis) expert testimony:

> We conclude that the people have failed to demonstrate that voiceprint evidence has achieved general scientific acceptance as a reliable identification device, and therefore the trial court erred in admitting the voiceprint evidence. We echo the statement of the California Supreme Court that this "decision is not intended in any way to foreclose the introduction of voiceprint evidence in future cases . . . when there is demonstrated solid scientific approval and support of (this) new method" of identification.

*People v. Tobey*, 257 N.W.2d 537, 540 (Mich. 1977).  Although decades have passed and, undoubtedly, the science of voice identification has progressed, and *Daubert* now provides the relevant standard for the admission of expert testimony, *Tobey* still binds the Michigan trial courts.  *See People v. Hubbard*, 738 N.W.2d 769 (Mich. 2007) (Justice Markman, concurring in the denial of leave to appeal, encourages the supreme court to revisit *Tobey* in light of *Daubert* and greater scientific acceptance); *People v. Hubbard*, 907 N.W. 2d 604 (Mich. 2018) (same); *Hubbard v. Woods*, No. 2:11-cv-191, 2014 WL 510643, at *8-9 (W.D. Mich. Oct. 3, 2014) (this Court adopted a report and recommendation noting that *Tobey* remains the standard in Michigan).

Moreover, even if the trial court were willing to disregard *Tobey* and conclude the proposed expert testimony satisfied the requirements of *Daubert*, and if the prosecutor were not afforded time to obtain rebuttal expert testimony, it would appear to be much more likely that the prosecutor would simply forego playing the recorded excerpts for the jury than that the prosecutor would play the excerpts and then permit expert testimony to cast doubt on their authenticity.  McGehee testified that Petitioner admitted the killing and said the victim got what she deserved.  The recording certainly bolstered that testimony, but the testimony would remain even if the recording were never played.

---

[3] The comments to Federal Rule of Evidence 901—upon which the Michigan Rule of Evidence is based—state the limitation even more broadly: "aural voice identification is not a subject of expert testimony . . . ."  Fed. Rule Evid. 901, Advisory Committee Notes.

Petitioner's counsel had an opportunity to challenge McGehee and Durham (another jailhouse informant) on cross-examination. Counsel presented the jury with ample evidence of the informants' incentive to provide false testimony against Cotton and even to fabricate the excerpt of conversation implicating Cotton. Under those circumstances, the Michigan Court of Appeals' determination that the expert's proposed testimony would not have changed the result is eminently reasonable. Petitioner has failed to show the appellate court's conclusions regarding his counsel's effectiveness are unreasonable on the record or unreasonable applications of or contrary to *Strickland*. Accordingly, Petitioner is not entitled to habeas relief on this claim.

McGehee's testimony indicated that, while he and Petitioner were jailed together, he had assisted Petitioner in drafting a letter to the judge relating to another criminal prosecution. The letter was handwritten. Counsel initially sought a handwriting expert, presumably, to resolve any issue regarding whether Petitioner or McGehee actually drafted the letter. McGehee's testimony, however, indicated that his assistance with the letter was not in the actual handwriting of it. Moreover, the prosecutor never introduced the letter, or any other handwritten evidence.

The Michigan Court of Appeals' resolution of this challenge was succinct:

> Cotton contends that counsel was ineffective when he sought to obtain a handwriting expert, but instead obtained a voice expert. We conclude that Cotton's issue lacks merit. The prosecutor did not admit any handwritten evidence in Cotton's case. Accordingly, counsel's decision not to obtain a handwriting expert was neither unreasonable nor prejudicial.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.532.)

In response to the court of appeals analysis, Petitioner simply reiterates the argument he raised in that court: counsel sought permission to hire a handwriting expert and then never followed through. (Pet., ECF No. 1, PageID.53.) Petitioner does not identify why his counsel should have "followed through" or what prejudice Petitioner suffered because counsel did not "follow through."

The court of appeals' conclusion that counsel's conduct with respect to the handwriting expert was neither unreasonable nor prejudicial is entirely consistent with *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

Petitioner next contends that counsel rendered ineffective assistance when he failed to develop or argue an alibi defense.  Petitioner's proposed alibi defense is founded on the cell-phone records that placed him further and further away from the crime scene as time passed that afternoon.  Petitioner contrasts those times with times neighbors claimed they heard gunshots and with the estimated time of death.

The court of appeals determined that Petitioner's claim was not supported by the record:

> Cotton asserts that counsel was ineffective when he failed to present an alibi defense and failed to present exculpatory phone records to the jury.  We conclude that the record does not support Cotton's assertion.  Counsel heavily relied on the phone records to contend that Cotton was not in Powell's apartment when the shooting took place.  Accordingly, counsel did present an alibi defense based on the exculpatory phone records.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.532.)

Petitioner, once again, presents the same argument to this Court that he presented to the state appellate courts.  He never even attempts to show that the court of appeals' factual determinations regarding the defense presented by Petitioner's counsel are contradicted by the record.  Petitioner has presented no evidence, much less clear and convincing evidence, to counter the appellate court's presumptively correct determination that counsel raised and relied upon the very argument Petitioner claims that counsel ignored.[4]  Moreover, the record clearly supports the determination of the Michigan Court of Appeals.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

---

[4] The jury was likely not swayed by the proposed alibi because the very firm times established by the cell-phone records did not necessarily conflict with the estimated times offered by the neighbors and the medical examiner.  The neighbors testified that they heard shots at some point during a range of times.  One end of the range was consistent with the cell-phone records; the other was not.  Similarly, the medical examiner offered a possible range of times between the point the victim was shot and the point where she likely bled out on the bathroom floor.

Petitioner next contends that his counsel failed him when counsel did not impeach Officer Heugel and Ante Webb.  Officer Heugel signed the affidavit of probable cause to secure Petitioner's arrest warrant.  That affidavit indicated that Petitioner had a gun in his possession outside of the victim's apartment.  Her police report also indicated that Petitioner had a gun.  Petitioner then states that Detective Heugel never saw him with a gun, therefore counsel should have impeached her.

There is nothing in the record showing that Detective Heugel stated she saw Petitioner with a gun.  Petitioner's argument is utterly specious.  He acknowledges that Ante Webb told Detective Heugel that Petitioner had a gun.

Petitioner then contends that his counsel should have used Webb's statement to Heugel to impeach Webb at trial because Webb testified at trial that he did not see that Petitioner had a gun. Even if Webb did not see Petitioner with a gun, Webb was convinced that he had one.  Webb testified that Petitioner took something from a gentleman in the back seat and then, when he exited the car, he straightened his shirt out.  Webb concluded that Petitioner had received a gun from the backseat passenger and then covered it up with his shirt as he left the car.  (Trial Tr., ECF No. 13-7, PageID.359-360.)

With respect to both of these impeachment arguments, Petitioner contends his counsel should have elicited testimony from Heugel and Webb that they had earlier asserted that Petitioner had a gun at the apartment.  The Michigan Court of Appeals recognized the absurdity of Petitioner's argument:

> There are times when it is better for counsel not to draw attention to a witness's testimony.  Cotton does not explain why reasonable counsel would want to [elicit] evidence from the witnesses that Cotton did, in fact, have a firearm.  Further, counsel impeached Webb with other evidence and attempted to place his credibility in doubt with the jury.  We conclude that counsel did not unreasonably fail to impeach Heugel's and Webb's statements that Cotton did not have a gun with evidence that they had previously testified that he did have a gun.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.532) (footnote omitted).

The only reason Heugel indicated Petitioner had a gun was because Webb had told her as much.  Webb testified regarding why he believed that Petitioner had a gun.  He also testified that he never saw a gun.  The prior inconsistent statement that Petitioner believes would be so compelling to jurors—"I saw Petitioner with a gun"—simply does not exist.  If it did, it would epitomize ineffective assistance for counsel to put that statement in front of the jury.  Petitioner's claim is plainly frivolous.

Petitioner uses the same language stating the "prosecutorial misconduct" issue in his petition as he used when stating the issue in the Michigan appellate courts.  Somewhere between the Michigan Court of Appeals and the Michigan Supreme Court, however, the argument changed from a reasonably coherent claim of vouching, bolstering, and arguing facts not-in-evidence, to an incomprehensible mishmash of citations and legal principles wholly unrelated to prosecutorial misconduct.  In this Court, Petitioner presents only the incomprehensible mishmash that he offered to the Michigan Supreme Court.

In his petition, Petitioner argues that the prosecutor did not have standing to present the jailhouse informants' testimony to the jury where that testimony was not assessed for reliability before it was elicited.  (Pet., ECF No. 1, PageID.57-61.)  It is also possible that Petitioner is arguing that the jailhouse informants did not have standing to testify.  Both arguments are misdirected.

Parties, not witnesses, must have standing to proceed in court.  There is no question that the Kent County Prosecuting Attorney has standing to pursue criminal prosecutions in the state courts.  *See* Mich. Comp. Laws § 19.153.  Indeed, the prosecutor is solely and exclusively vested with that authority:

> Our Legislature enacted the Michigan Penal Code to, among other things, define crimes and prescribe the penalties for crimes.  MCL 750.1 *et seq*.; MSA 28.191 *et seq.*; Preamble, 1931 PA 328, amended by 1991 PA 56, § 1.  In other words, as a matter of public policy, the code defines what acts are offenses against the state.  The authority to prosecute for violation of those offenses is vested solely and exclusively with the prosecuting attorney. Const. 1963, art. 7, § 4; MCL 49.153; MSA 5.751.  A prosecutor, as the chief law enforcement officer of a county, is granted the broad discretion to decide whether to prosecute or what charges to file. *People v. Jackson*, 192 Mich App 10, 15, 480 NW2d 283 (1991); *Williams, supra* at 609, 465 NW2d 376. The prosecution

is not for the benefit of the injured party, but for the public good.  See *Morrow, supra* at 163, 542 NW2d 324.  Crimes not only injure the victim, but society in general, and the conviction of a crime results not only in a sentence enumerating the punishment in quantitative amounts, but also carries with it society's formal moral condemnation.

*People v. Williams*, 625 N.W.2d 132, 134 (Mich. Ct. App. 2001).

The prosecutor is also permitted to choose the witnesses she will call.  *People v. Burwick*, 577 N.W.2d 813, 815-17 (Mich. 1995).  There is no "reliability" test that the trial court must apply before a witness may testify.  The issue of credibility or reliability is to be resolved by the trier of fact—here, the jury.  *People v. Jackson*, 212 N.W.2d 918 (Mich. 1973).  Moreover, the fact that McGehee and Durham—and other witnesses—were prisoners, does not render them incompetent to testify.  *See Smith v. Brown*, 2 Mich. 161, 1851 WL 1778 (Mich. Jan. 1851) ("[N]o person shall be excluded from giving evidence in any matter, civil or criminal, by reason of crime, or of his interest in the event as party or otherwise; but conviction of crime may be shown as affecting credibility.").  Petitioner's prosecutorial misconduct argument is plainly frivolous.

Finally, Petitioner argues that his due process rights were violated when the trial court admitted the excerpts of recorded conversations because: (1) the recorded excerpts were more prejudicial than probative in violation of Michigan Rules of Evidence 402 and 403 (Pet., ECF No. 1, PageID.63-65); and (2) the evidence could not be admitted as a prior consistent statement and was not appropriate for impeachment (*Id*.).  The court of appeals rejected both arguments:

> MRE 901 provides that a proponent of evidence must provide "evidence sufficient to support a finding that the matter in question is what the proponent claims."  "[A] audio ordinarily may be authenticated by having a knowledgeable witness identify the voices on the table."
>
> Cotton contends that the trial court improperly admitted the audio recording because there was no evidence that the voice on the recording was Cotton's. We disagree.
>
> Here, McGehee testified that the voices on the recording were his own and Cotton's. McGehee was present when the recording was made.  Thus, the prosecutor laid a proper foundation to admit the audio.  Whether McGehee correctly identified Cotton's voice was a proper topic for cross-examination.  When counsel asked McGehee if he was sure that the voice was Cotton's, McGehee said that he was sure.

Cotton also contends that the evidence was more prejudicial than probative under MRE 403 because Cotton did not testify and could not be impeached.

"Evidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury."  Evidence of a defendant's motive is relevant.  Here, the prosecutor did not offer the statement as a prior, inconsistent statement.  Rather, the prosecutor offered the statement as direct evidence of Cotton's motive to kill Powell.  Accordingly, the evidence was relevant and it was not marginally probative.  Further, there is no indication that the evidence injected extraneous considerations into the case.  We conclude that the trial court did not abuse its discretion by admitting the recording of Cotton's conversation with McGehee.

(Mich. Ct. App. Op., ECF No. 13-12, PageID.534-535) (footnotes and heading omitted).

Although Petitioner coats his argument with a gloss of habeas-cognizability by claiming a due process violation, the crux of his argument is that admission of the tapes violated the Michigan Rules of Evidence.  As noted above, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions."  *Estelle*, 502 U.S. at 67-68.  The appellate court's conclusion that the admission did not violate the state rules binds this Court.  *See Wainwright*, 464 U.S. at 84; *Stumpf*, 722 F.3d at 746 n.6.

State court applications of state court rules, whether or not they are violations of the state rules, can rise to the level of a due process violation if they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.  *Seymour*, 224 F.3d at 552; *accord Coleman*, 268 F.3d at 439; *Bugh*, 329 F.3d at 512.  Petitioner must show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or that the state court decided the evidentiary issue differently than the Supreme Court did on a set of materially indistinguishable facts.  *Sanders*, 221 F.3d at 860.  Petitioner has not and cannot make that showing.

Petitioner has not identified any Supreme Court authority with materially indistinguishable facts that was resolved in favor of his position. The state court concluded that Petitioner's recorded statements were not hearsay. Even if they were, however, their admission would not run afoul of clearly established federal law. "The first and most conspicuous failing . . . is the absence of a Supreme Court holding granting relief on [that] due process theory: that the admission of allegedly unreliable hearsay testimony violates the Due Process Clause. That by itself makes it difficult to conclude that the state court of appeals' decision 'was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.'" *Desai v. Booker*, 732 F.3d 628, 630 (6th Cir. 2013) (quoting 28 U.S.C. § 2254(d)).

Petitioner's general objection that the evidence was more prejudicial than probative was rejected by the state court of appeals. As the appellate court noted, however, the issue is not "prejudice"—indeed almost all evidence introduced by the prosecutor will be prejudicial against the defendant—the issue is unfair prejudice. The court of appeals concluded the evidence was more than marginally probative of Petitioner's motive, a relevant consideration for the jury. Petitioner has not identified any Supreme Court authority holding that the admission of a defendant's own out-of-court statement regarding the motive for the crime being prosecuted violates due process. Accordingly, Petitioner cannot show the state appellate court's determination of that claim is contrary to, or an unreasonable application of, clearly established federal law. Petitioner is not entitled to habeas relief.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263

28

F.3d at 467.   Consequently, I have examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."   *Id.*   "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims would be debatable or wrong.   Therefore, I recommend that the Court deny Petitioner a certificate of appealability.

For the foregoing reasons, I recommend that the habeas corpus petition be denied.   I further recommend that a certificate of appealability be denied.

Dated:   February 11, 2019                          */s/ Timothy P. Greeley*
                                                     Timothy P. Greeley
                                                     United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).